UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.                             Case No.

REAL PROPERTY LOCATED AT
101 MARSHALL AVENUE,
LAKE PLACID, FL 33852,

     Defendant.

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Plaintiff United States of America brings this complaint and alleges upon information and belief as follows:

### NATURE OF THE ACTION

1.     This is a civil action in rem, to forfeit to the United States of America, the real property, attachments thereto, and appurtenances thereon, located at 101 Marshall Avenue, Lake Placid, Florida 33852 (the Defendant Property).

## VENUE AND JURISDICTION

2.      Venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395, because the acts giving rise to the forfeiture accrued in the district.

3.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides the Court with jurisdiction over actions to recover or enforce forfeitures.

4.      This Court has *in rem* jurisdiction over the Defendant Property because pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida. 28 U.S.C. § 1355(b)(1)(A).

5.      Pursuant to Rule G(3)(a) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, and 18 U.S.C. § 985(c)(2), a notice of this forfeiture, as well as a copy of the complaint, shall be posted on the real property and served on the owner of the real property. Thereafter, neither the issuance of a warrant *in rem* nor any other action will be necessary for the Court to establish *in rem* jurisdiction over the Defendant Property. 18 U.S.C. § 985(c)(3).

## STATUTORY BASIS FOR FORFEITURE

6.     The Defendant Property represents proceeds of violations of 18 U.S.C. § 1343 (wire fraud), or a conspiracy to commit wire fraud (18 U.S.C. § 1349) and is, therefore, subject to civil forfeiture by the United States, pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property, real or personal, which constitutes or is derived from proceeds from any offense constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offenses.  18 U.S.C. § 981(a)(1)(C).  Section 1956(c)(7)(A) incorporates the racketeering activities listed in 18 U.S.C. § 1961, which includes a wire fraud offense in violation of 18 U.S.C. § 1343.  *See* 18 U.S.C. § 1956(c)(7)(A), and 18 U.S.C. § 1961(1).

7.     Additionally, because the financial transactions conducted to purchase and build the Defendant Property were designed to conceal and disguise the nature, location, source, control, and ownership of the criminal proceeds use to purchase and build a single family residence on the property, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), it is also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because the government may forfeit any property that was involved in any transaction or attempted transaction in violation of section 1956.

3

8. Specific facts supporting the forfeiture of the Defendant Property have been provided by John Sermons, Special Agent of the Federal Bureau of Investigation (FBI), who states as follows:

## FACTS

9. John Sermons has been employed as a Special Agent with the FBI since January 3, 2010. He is presently assigned to the Tampa Division, Lakeland Resident Agency where his duties include investigating organized crime, violent crimes, frauds and swindles, and other major federal violations. SA Sermons is authorized to investigate violations of the laws of the United States, and to execute arrest, search, and seizure warrants issued under the authority of the United States.

## I.   SYNOPSIS OF CONSPIRACY

10. Jared Murray is an inmate (No. R33245) housed at the Florida Department of Corrections ("FDOC") South Bay Correctional Facility in South Bay, Florida. While incarcerated, Murray has devised and executed— and continues to execute—a scheme to defraud Lowe's Home Improvement out of well over a million dollars' worth of inventory.

11. Murray directed the scheme from prison using multiple cell phones that were smuggled into the South Bay Correctional Facility. At least one phone, so far, has been recovered and examined pursuant to court-

approved search warrant. Content tied to the phone revealed, among other details, that Murray defrauded Lowe's out of building supplies by stealing the identities of contractors who had open lines of credit at the store. The scheme generally worked as follows:

12.     Someone impersonating a contractor, or the contractor's representative, would contact Lowe's to place a large order for building supplies—often thousands of dollars' worth of supplies. The supplies (*e.g.*, shingles) were paid for using the contractor's open line of credit. The purchases appear to have been made without the contractors' authorization or knowledge.

13.     Murray would sell, or would cause the sale of, the supplies online at a substantial discount to third-party buyers using apps such as OfferUp.com ("OfferUp").[1] Delivery would be coordinated with third-party buyers, sometimes using the delivery service offered by Lowe's or through "mules" associated with Murray. Once delivered, Murray had conspirators, including a romantic interest named Candance Skinner, collect payment from the third-party buyers. They would, in turn, make sure that the fraud proceeds were deposited and/or transferred as Murray directed, including, at times, keeping

---

[1] OfferUp.com is an online consumer-to-consumer marketplace and considered a competitor to Craigslist.

some of the ill-gotten gains for themselves. Murray sent orders using the smuggled cell phones.

14.     Often, Murray directed the fraud proceeds to be deposited into a Wells Fargo bank account ending in 4015, held in the name of conspirator, Evelyn Battle, and an individual named J.M. (Wells Fargo Account 4015). According to Murray's visitation log at the South Bay Correctional Facility, Battle is his "aunt." She is integral in the scheme. Battle manages the fraud proceeds, including paying contractors who are building a residential home on the Defendant Property. That home, which is nearing completion, is already listed for sale on MLS for $185,000. *See* https://www.realtor.com/ realestateandhomes-detail/101-Marshall-Ave_Lake-Placid_FL_33852_M66546-03572 (last accessed May 7, 2020). Murray has not only paid the builders using fraud proceeds from the scheme, he appears to have used stolen building materials from Lowe's to help complete construction.

15.     By using the proceeds obtained from the fraudulent Lowe's scheme to pay contractors and to construct the residence on the Defendant Property, and by funneling these proceeds through an account held in the names of others, the defendant has been able to conceal the nature, source, ownership and control of the proceeds obtained from the fraudulent scheme.

16.     The facts of the scheme and the investigation are set forth in greater detail below.

## II.     BACKGROUND ON THE INVESTIGATION

17.     In November 2019, law-enforcement officers from the Lake Wales Police Department ("LWPD") responded to a Lowe's store on Highway 27 in Lake Wales, Florida, in reference to a possible fraud. As the officers learned, on or about November 15, 2019, an individual purporting to be "Wayne Jones" had fraudulently charged approximately $4,009.70 to a contractor account belonging to Duane McQuillen Construction. According to Lowe's, "Jones" purchased a load of roofing shingles and scheduled their delivery to an address in Winter Haven, Florida ("Winter Haven Address"). A Lowe's delivery service took the load to the identified addressed where a woman, later identified as H.R., redirected the delivery to 2192 Lake Drive NW, also in Winter Haven, Florida.

18.     On or about November 20, 2019, "Jones" fraudulently purchased more roofing shingles from Lowe's, this time using an account belonging to the contractor Bobby T Inc. "Jones" requested delivery of the fraudulent purchase, which totaled approximately $5,024.13, to the same address, the Winter Haven Address. There, H.R. accepted delivery and signed the name "Wayne Jones" for receipt. On or about November 21, 2019, members of the

Polk County Sheriff's Office notified an LWPD detective that they had recovered both deliveries of the fraudulently purchased shingles.

19.     The LWPD detective contacted H.R. at the Winter Haven Address. H.R. advised that she had purchased the subject shingles on OfferUp. The seller identified himself as "Robert," but used an OfferUp account named "Mike Myers" with an associated telephone number of "(786) XXX-1284." As set forth in greater detail later, investigators have connected the phone number "(786) XXX-1284" to Murray as well as to other fraudulent orders placed with Lowe's during the scheme.

20.     According to H.R., she purchased the shingles for approximately 50% of their typical price. H.R. further advised that, after delivery, a woman named "Lisa" arrived at the Winter Haven Address to collect cash for the shingles. In a subsequent transaction with H.R. under the supervision of law-enforcement, "Lisa" would later be positively identified as conspirator Candance Skinner, who is one of Murray's love interests.

### III.    INFORMATION RECEIVED FROM OFFERUP

21.     After making contact with H.R., LWPD officers applied for and received a search warrant for records from OfferUp associated with any account tied to the telephone number "(786) XXX-1284." In response, OfferUp produced information associated with approximately six accounts,

which had been created using the same device or contained references to the telephone number "(786) XXX-1284" in messages.

22.     OfferUp's response contained records for User ID 65802183, which had the user name "Mike Myers" and the listed email "myersroofing95@gmail.com." OfferUp also provided a screenshot of an advertisement tied to the OfferUp account "Mike Myers." The screenshot showed what appeared to be pallets of Timberline shingles as well as a screenshot of a cellular telephone that contained text communication. The screenshot of the text featured the number "(727) XXX-8779" and an image of, what appeared to be, a moving truck loaded with roofing shingles. Investigators have tied this number to individuals who were caught delivering roofing shingles late in the evening to the Defendant Property.

23.     From in or about late October 2019, until on or about November 15, 2019, User ID 65802183 ("Mike Myers") sent multiple messages to prospective buyers requesting that they call him at "(786) XXX-1284"— the same phone number in contact with H.R.

24.     OfferUp Account 64338862 also appeared to be tied to the subject phone number "(786) XXX-1284." For example, the user of Account 64338862 sent a prospective buyer a message that read, in part, "Is this the # that called u Nelson . . . 786-XXX-1284."

25.     In another communication, the user of Account 64338862 was contacted by an individual named M.H. with the associated telephone number "(470) XXX-3913." On or about October 2, 2019, M.H. appeared to inquire if Timberline Roofing Shingles were "still available." As detailed later, phone and bank records secured during the investigation (which is ongoing) corroborate that M.H. would eventually purchase stolen supplies from Murray.

### IV.   "LISA," IDENTIFIED AS CANDANCE SKINNER

26.     On or about November 24, 2019, H.R. notified LWPD that "Robert" was trying to sell her more shingles. According to H.R., "Robert" advised that, this time, H.R. would have to pick the shingles up at a Lowe's store at 2301 US Highway 92 W in Auburndale, Florida. Under the direction and supervision of law-enforcement officers, H.R. agreed to the purchase.

27.     The LWPD detective observed H.R. visit the "Pro Desk" at the designated Lowe's store and then have the shingles loaded into her vehicle for transport. The LWPD detective observed H.R. and the shingles for the entire ride to the Winter Haven Address, where the previous transaction had taken place. After arriving, H.R. and the LWPD detective waited for "Lisa" to arrive to collect payment.

28.     Within an hour, a female—later positively identified at as Candance Skinner (a/k/a Candance Storer[2])—arrived at the Winter Haven Address to collect the money. Once H.R. provided the cash payment for the shingles, Skinner was arrested.

29.     Subsequent to her arrest and after being advised of her rights, Skinner was voluntarily interviewed at the Auburndale Police Department in Auburndale, Florida. During the interview, Skinner admitted that she had collected cash from H.R. on two separate occasions, likely referring to the two previous deliveries of stolen shingles. Skinner said she did so at the direction of "Jay"—believed to mean Murray—whom she had met via Facebook. "Jay" had asked Skinner to assume the alias "Lisa" and then collect the cash from H.R. Skinner admitted that the transaction with H.R. was probably not "legit."

30.     After accepting the cash, Skinner said that "Jay" allowed her to deposit the fraud proceeds into her checking account and to use the funds as

---

[2] It was confirmed during the investigation that Skinner uses the alias "Candance Storer." For example, a search warrant was issued to search a cell phone in Skinner's possession at the time of her arrest. Skinner's cell phone contained, among other content, a Facebook account 100000117550545 with the associated profile name "Candi Queen (*C Skinner-Storer A Realist*)" (emphasis added.) The Facebook account appeared to belong to Skinner given a number of user attributes, including that it contained images of Skinner and her daughters. The URL for the Facebook account was the name "Candance Storer." Additionally, bank records obtained from Wells Fargo for Skinner reference the name "Candance Storer."

needed. Jay also directed Skinner to send money to random people via "Cash App."[3]

31.      This information was corroborated by content on Skinner's phone, which law-enforcement officers examined pursuant to a search warrant. Skinner stored Murray's phone number "(786) XXX-1284" under the name "BAE," which is a term of endearment.  Review of Skinner's seized device corroborated Murray's association with the phone number "(786) XXX-1284."  For example, on or about November 22, 2019, Skinner texted "(786) XXX-1284" a screenshot for a contact named "Jared Ol Slick Ass" with the associated phone number "(786) XXX-7236." The contact's photo was of Murray. The phone number "(786) XXX-7236," critically, was assigned to another cell phone belonging to Murray, which was recovered from the South Bay Correctional Facility during the investigation.  Further, on or about October 31, 2019, Skinner texted "(786) XXX-1284" stating: *"You see my wallpaper for my phone …"* The attached photo showed Murray wearing a white shirt and blue pants, squatting in front of a white brick wall. Other images of Murray were found on Skinner's device. Two of the images showed Murray wearing what appeared to be a partial/full prison uniform.

---

[3] Cash App is a mobile payment service developed by Square, Inc., allowing users to electronically transfer money to one another.

Additionally, Skinner's phone contained an image of FDOC's Request For Visiting Privileges Form, which sought authorization to visit Murray, inmate number R33245, at South Bay Correctional Facility located at 600 US Highway 27 South in South Bay, Florida.

32.     In the days leading up to the deliveries, Skinner and Murray exchanged a series of texts messages regarding the transactions.  The messages appeared to show Murray directing Skinner to pick up cash for the sale of the stolen Lowe's shingles.

33.     For example, on or about November 16, 2019, Skinner's phone contained a text from Murray's phone, "(786) XXX-1284," stating: *"I had really needed uto pick it up cause I gotta send main man his 400 cut.. but u can get it timmariw."*  Skinner later responded by text: *"Bae it's 2k on the cashapp I can do that now if you like.  Stop stressing.  N I have money in my account. … We're a team don't you ever forget it."*

34.     In the same time frame, Skinner wrote to Murray (786-XXX-1284) asking for an address: *"Don't forget to text me that SA address bc I'm going to try n leave work by 0630."* Approximately four minutes later, Murray (786-XXX-1284) texted the Winter Haven Address, which was the location of H.R.'s deliveries. Another message from Skinner read: *"Ok bae I'm heading to winter haven."* Contemporaneous to these texts, GPS travel data on Skinner's phone

included directions to the Winter Haven Address on the same day as one of

the deliveries (*i.e.*, on or about November 20, 2019).

35.    The messages also appeared to show Murray directing Skinner to

deposit the fraud proceeds into Wells Fargo Account 4015.  On or about

November 18, 2019, Murray (786-XXX-1284) texted Skinner as follows: *"Baby*

*1550 will be in your cash app sometime today ok?? Once u get that out 300 on my*

*account. . . . Then I need uto get 3000 and deposit it into my contractor account. Evelyn*

*battle at wells Fargo bank bae. . . . It's J.M. and Evelyn battle name on the account."*

J.M. owns a construction company in Lake Placid, Florida. He was also co-

signor on the Wells Fargo Account 4015.  The investigation has revealed that

Murray hired J.M. to build a residence on the Defendant Property. Murray

paid J.M. using fraud proceeds from the scheme, Murray also used the scheme

to steal supplies to complete construction.

36.    That same day, Murray (786-XXX-1284) texted Skinner an

image depicting routing number 063107513 and account number 5607194015,

which refers to Wells Fargo Account 4015.

**V.    SAMSUNG SM-J260T1: A CELL PHONE USED BY MURRAY IN PRISON**

37.    Inspectors at the South Bay Correctional Facility reported that,

on or about December 5, 2019, an inmate A.J. surrendered a Samsung cell

phone (model SM-J260T1) to corrections staff, advising that it belonged to

14

Murray. According to A.J., he had been acting as Murray's "hold down" since in or about September 2019. This meant that Murray paid A.J. approximately $200 a month to hold the Samsung phone and, further, allowed Murray to "do business" in A.J.'s prison cell. A.J. also acted as a lookout for Murray.[4]

38.     A.J. advised that Murray's "business" involved calling various Lowe's stores using the Samsung phone, then falsely identifying himself as a representative of a contractor. Murray would then ask the Lowe's store to check the status of the contractor's line of credit and to confirm the available credit. When the available amount was confirmed, Murray would place an order for materials. Then, Murray would direct associates to the Lowe's store to pick up the materials, which they would split. According to A.J., Murray sold some of the materials on OfferUp. According to A.J., Murray claimed to have made $1,000,000 from the scheme and, further, that Murray stored some of the fraud proceeds in a safety deposit box maintained and accessed by his attorney, whose name was unknown to A.J. The investigation has confirmed the existence of a safety deposit box and a related account for "Jared Murray Revocable Living Trust Agreement" at Republic Bank and Trust Co.

---

[4] A.J. also held some understanding that, as part of their arrangement, Murray would pay the lawyer's fees related to a clemency application A.J. desired. According to A.J., Murray had only paid part of the anticipated fee and, accordingly, the application was never filed. A.J. felt that Murray had breached their agreement and, as such, reported the phone to corrections staff.

Consistent with A.J.'s reports, the assets are being maintained by a local attorney.  Murray also acknowledged a safety deposit box in a "WhatsApp" conversation, which investigators found on Murray's cell phone after it was seized from the South Bay Correctional Facility.

39.     SA Sermons reviewed the Samsung phone (the "Seized Phone") pursuant to a court-approved warrant. The Seized Phone had two associated MSISDNs, or telephone numbers: "(754) XXX-5507" and "(786) XXX-7236."

40.     As noted previously, "(786) XXX-7236" is associated with Murray. Skinner's device contained an MMS message dated on or about November 22, 2019, which consisted of a screenshot for a contact named "Jared Ol Slick Ass" with the associated number "(786) XXX-7236" and a photo of Murray. This screenshot was delivered to Murray's other known phone number, "(786) XXX-1284."

41.     According to the Lowe's Asset Protection unit, the Seized Phone's alternate number, "(754) XXX-5507," was used to place a fraudulent order tied to the name "R.G." and an address in Athens, Georgia (the Athens Address). References to "R.G." and the Athens Address were contained in messages with M.H., who was one of Murray's buyers on OfferUp as described previously. M.H.'s known phone number, "(470) XXX-3913" was programmed into the Seized Phone as "Mr. H."

42.     Further review of the Seized Phone revealed additional attributes linking it to Murray. For example, on or about November 29, 2019, Skinner, using number "(813) XXX-8585," which saved under the contact name "BABY" texted in part: *"I looovveee Jared Murray with all my heart, body, n soul. N we have an unbreakable bond 4 life."* Another message from "BABY" contained an image of Skinner and a younger female, stating *"This is my right hand right her bae."* In response, Skinner was sent an image of Murray.

43.     In addition, the Seized Phone contained numerous emails from the associated account "murrayjared97@gmail.com." The communications frequently addressed the recipient as "Jared." Additionally, many emails referenced the Defendant Property. A number of communications to/from "murrayjared97@gmail.com" involved contractors for drafting, HVAC, plumbing, and related services.

44.     Other emails on the Seized Phone further link the device and the scheme to Murray.  For example, an email titled "Benjamin Williams" dated on or about November 25, 2019, which read in part, "I have a contract for you to sign and return to our office with your payment." Subsequent emails appeared to contain a document that required electronic signature and was titled "Agreement for Representation-Someone Else Hiring." Notably, just days before this email, on or about November 22, 2019, an individual named

"Benjamin Williams" was arrested after picking up a fraudulent order at a Lowe's store in Charlotte County, Florida. Per Lowes Asset Protection, the telephone number associated with the fraudulent order was (786) XXX-1284, which is one of Murray's known numbers. Multiple contacts in the Seized Phone also established additional links to Murray and the scheme. In addition to "Mr. H" (a buyer from OfferUp), the Seized Phone had contacts for "Kita" (678-XXX-8571) and "Jeanna" (404-XXX-4879). These women have close ties to Murray.

45.     First, "Kita" refers to Vonkita Green. Bank records from Bank of America and Navy Federal Credit Union associate the phone number "(678) XXX-8571" with Green. Green also visited Murray at the South Bay Correctional Facility as documented on his visitation log. Additionally, as detailed later, Green deposited cash into Wells Fargo Account 4015.

46.     As for "Jeanna," "(404) XXX-4879" is associated with an address in Lithonia, Georgia and with "Jeanna Johnson," who commonly goes by Jeanna Charles.[5] On or about July 26, 2019, Charles deposited $6,400 into the Wells Fargo Account 4015.  "Jeanna Johnson (Charles)" was also listed on Murray's prison visitation log.

---

[5] A marriage certificate in the Florida Driver and Vehicle Information Database ("DAVID") shows that "Jeanna Johnson" had the legal name "JEANNA CHARLES" prior to her marriage in 2016.

47.     As detailed below, Murray coordinated the sale of stolen Lowe's product to M.H. (*i.e.*, "Mr. H.") and the collection of payment with Green and Charles using the Seized Phone, which contained the below-referenced messages.

### VI.     SALES OF STOLEN PRODUCT TO M.H.

48.     On or about November 25, 2019, M.H. texted Murray about shingles, stating: *"I need 80 square of regular 3tab royal sovereign charcoal and the 80 square timberlan charcoal HD."* Murray agreed to the sale and that the merchandise would be delivered to M.H.

49.     On or about December 1, 2019, Murray texted M.H., stating: *"Also I just wanted to let you know that in the event that you needed some stuff like right away the same day all you got to do is go to the Lowe's Home Improvement in Athens Georgia go there but go there like after 3 or anytime after 3:00 and we can get whatever we want the same day my cousin's work there."*

50.     The next day, Murray texted "Kita"—meaning Green—a message that read: *"Tonight I need u to go pick up 2500 from chico man."* "Chico man" appeared to refer to M.H. Shortly thereafter, "Kita" responded: *"Jared, remember I don't stay over there no more."*

51.     Murray, in turn, texted "Kita": *"Imma see can he meet you??"* *"If he can where to tell him to meet you??"* "Kita" responded: *"Forest Park."*

52.     Murray then texted M.H.: *"Can u meet my girl tonight at forest park to drop her money fir today's order."* M.H. responded in effect that Forest Park was an hour away. Upon sharing the concern with "Kita," she replied: *"Thats the closest i can come unless he come to my job tomorrow."* Shortly thereafter, Murray texted "Kita" that stated: *"Imma have someone else pick it up and cash app u."*

53.     Murray then texted M.H.: *"Address asap . . . She need to put it in her address."* M.H. responded and provided an address in Austell, Georgia. Within minutes, Murray texted the Austell, Georgia address, M.H.'s telephone number, and his name to "Jeanna"—meaning Jeanna Charles a/k/a Jeanna Johnson.

54.     Later that day, Murray sent M.H. what appeared to be a Lowe's delivery status notification for R.G. at the Athens Address.  As stated previously, a number associated with the Seized Phone (*i.e.*, 754-XXX-5507) was used to make a fraudulent Lowe's order tied to the Athens Address.

## VII.    <u>TRACING OF FRAUD PROCEEDS INTO CONSTRUCTION OF DEFENDANT PROPERTY</u>

55.     From at least July 2019 through the present, Murray has used both construction materials and proceeds obtained from this fraudulent scheme to construct a single family residence on the the Defendant Property.

56.    As discussed above, at Murray's direction, the fraud proceeds were often deposited into Wells Fargo Account 4015.  Bank records confirm that funds were then withdrawn from this account, and used to pay for labor and materials in the construction of the residence on the Defendant Property. Murray also used stolen merchandise from the scheme in the construction of the residence.

57.    As set forth below, at least $73,990.39 of funds and product used in the construction of the residence on the Defendant Property can be traced to fraudulent proceeds and material from Murray's Lowe's scheme. During this entire time, Murray has been incarcerated and has not had any legitimate income.

**A.    Purchase of Lot and Beginning of Construction**

58.    Public records for Highlands County, Florida, reflect that Murray, purchased the Defendant Property – as a vacant lot – on or about July 2, 2019, for approximately $4,500.00.  Payment for the property was made from a bank account belonging to Tantashea T. Bell, who had an address in South Saint Petersburg, FL. Bell is an associate of Murray's and was listed on his Geo South Bay Prison visitation log. In addition, Bell's address in South Saint Petersburg, Florida, is listed as Murray's current mailing address on a Highlands County tax bill for the Defendant Property.

Despite purportedly making the payment for the purchase of the lot, however, Bell is not listed as an owner on the deed or in any other public records for the Defendant Property.

59.    A Notice of Commencement for the Defendant Property was filed and recorded in the public records in and for Highlands County, Florida, on or about July 22, 2019, reflecting Murray's intention to construct a residence on the property.  Murray is listed in the notice as the "Owner Builder," and Battle signed the notice as the "Owner or Lessee, or Owner's or Lessee's Authorized Officer/Partner/Manager."

60.    Highlands County's building records reflect that building permits were first issued for the new construction on the Defendant Property on or about July 29, 2019.

61.    A confidential informant ("CI") has corroborated that Murray owns the Defendant Property, where he has been constructing a home, and that Battle is managing the property. The CI further corroborated that the phone number "(786) XXX-1284" -- which was used in connection with the OfferUp transactions -- belonged to Murray.

**B.    Wells Fargo Bank account ending in 4015**

62.    As discussed above, as part of the scheme, Murray regularly directed others to deposit proceeds from the fraudulent scheme into Wells

Fargo Account 4015. The funds in the account were then used to pay construction related expenses for the Defendant Property.

63.   Wells Fargo records reveal that Wells Fargo Account 4015 was opened on or about July 9, 2019, with Battle and J.M. listed as the account holders.  As noted above, J.M. is a Lake Placid contractor hired by Murray to build the single family residence on the Defendant Property[6], and Battle is Murray's "aunt" who is listed on Highland County records as Murray's "Authorized Officer/Partner/Manager" for the construction of residence on the Defendant Property.

64.   Wells Fargo Account 4015 records were reviewed for the time period from the account opening on July 9, 2019, through early June 2020. During this time, deposits to the account totaled approximately $103,112.70, and withdrawals totaled approximately $103,112.70. While the account is still open, there has been no activity in the account since February 7, 2020, and the account has had a zero balance since that time.

65.   Approximately $70,208.70 of the deposits (about 68%) came from individuals who, as detailed above, have been assisting Murray with the

---

[6] Highlands County's building records confirm J.M.'s contractor status and relationship with Murray.  The records note that any questions regarding the construction should be directed to "[J.M.]. . . he is helping the Owner Builder." *See* http://permits.hcbcc.org/eGovPlus90/permit/plan_notes.aspx?permit_no=19070518&rev_stop=BUILDING&rev_no=1 (last accessed on June 17, 2020).

fraudulent scheme. J.M., the contractor hired by Murray to build the residence on the Defendant Property, made minimal deposits totaling approximately $2,500. The remaining deposits (approximately $30,364.00) were all cash deposits.

66. The largest number of deposits came from Vonkita Green, who helped Murray collect payments from the fraudulent scheme. During the time period reviewed, Green deposited 10 checks into Wells Fargo Account 4015, totaling $43,573.70.

67. There were also significant deposits to the account from other individuals connected to the scheme, including M.H. ($8,590), Jeanna Charles ($6,400), and Skinner ($3,000). Additionally, a $3,990.00 cashier's check from an individual named M.R.F. was deposited into the account on or about December 30, 2019. The investigation revealed that M.R.F. was arranging pickups of fraudulently acquired merchandise from a Lowe's location in Alpharetta, Georgia. Specifically, in December 2019, Lowe's notified law enforcement that a fraudulent order had been placed and was to be picked up at the Alpharetta, Georgia store. Law enforcement intercepted the individual who came to pick up the fraudulent order. The individual advised that he had been instructed by M.R.F. to pick up a load of shingles. The individual further advised that he had picked up materials for M.R.F. about four or five times.

68.     A closer review of these deposits confirms their connection to Murray's fraudulent scheme. A $3,000 check (number 141) from a Wells Fargo Bank account belonging to "Candance M. Storer" was deposited into Wells Fargo Account 4015 on or about November 18, 2019. "Candance Storer," as explained above, is Skinner's confirmed alias. The amount of the check and the date of deposit reconcile with contemporaneous text messages between Skinner and Murray (786-482-1284). As set forth in greater detail in paragraph 35, above, Murray texted Skinner in November 2019: *"I need uto get 3000 and deposit it into my contractor account. Evelyn battle at wells Fargo bank bae."* These directions from Murray also confirm that he views Wells Fargo Account 4015 as his account.

69.     As detailed in paragraphs 25 and 48-54, above, M.H. purchased some of the stolen construction materials from Murray. The two checks bearing M.H.'s name as remitter were deposited into Wells Fargo Account 4015, totaling approximately $8,590. One of the checks from M.H. was labeled "Material Roofing."

70.     Since Wells Fargo Account 4015 was opened, neither Murray nor Battle appear to have had any legitimate source of income. Murray has been incarcerated since approximately October 13, 2010. According to the Florida Department of Economic Opportunity (FDEO), Murray's last

reported wages were $111.80 in the first quarter of 2008 and Battle's last reported wages were approximately $6,380.15 in the third quarter of 2009.

71.     Based on the activity in the account as well as Murray's conversations with others, it appears that, despite being held in Battle's name, Murray actually directs and controls activity in Wells Fargo Account 4015. Additionally, in WhatsApp conversations located on the Seized Phone, Murray acknowledges the risk in having Battle's name on the account and property records due to her limited income.  For example, on or about November 26, 2019, Murray communicated with someone named "Jit" on WhatsApp. Murray stated: *"I'm calling around out of state trying to get my customers to move."*  "Jit" then responded *"So dam if you don't do that bro be careful with how you get the money to auntie"*—believed to be Battle—*"you know the account and the house got her name on it she in a fixed income if they tap into her shit bro she can't explain the shot and they gonna freez account just be careful keep the paper trail away from auntie caloro can get fucked up and look they been sending money to auntie house bihh you got to use these how's for the bs bro don't tell the hoes shot and break them off to use they cash apps and WesternUnion bro frfr the lady 73."*  Approximately two minutes later Murray responded by saying *"I been stop using aunti … Address. … And aunti got a safe deposit box . . . No paper trail son …*

*Ghats just between me and u.*" This may explain why Wells Fargo Account 4015 has had no activity since early February 2020.

72.     All of the approximately $103,112.70 deposited into Wells Fargo Account 4015 has been withdrawn from the account, with approximately $77,475.17 being used to pay home improvement/construction expenses that appear to be related to the construction of the Defendant Property, including the following:

| Vendor | # of Transactions | Amount |
|---|---|---|
| Jahna Concrete Inc. | 6 | $12,868.54 |
| Joey Messana | 7 | $12,300.00 |
| JM III Developers Inc. | 6 | $17,150.00 |
| Tillman Construction | 1 | $8,000.00 |
| Smith Woodworks | 1 | $6,700.00 |
| CL Wilson Construction Inc. | 1 | $5,700.00 |
| Scosta Corporation | 1 | $5,161.63 |
| New Southern Concrete | 2 | $3,540.00 |
| Coleman Plumbing | 1 | $2,885.00 |
| Joes Lawn Care/Trees | 1 | $2,000.00 |
| Sunset Drafting Inc. | 1 | $1,170.00 |

73.     There were also additional, smaller withdrawals during this period that appear to be related to maintenance of the Defendant Property, including $1,621.24 paid towards local county fees/taxes, a $600.00 check

with the notation that the check was being written for "101 Marshall Ave," and $2,324.83 in other miscellaneous expenses (e.g., pest control).[7]

74.     In total, at least $82,021.94 of the funds withdrawn from Wells Fargo Account 4015, which was at least 68% funded with proceeds from the fraudulent scheme, were used towards the maintenance and construction of the residence on the Defendant Property.

### C.   Use of Stolen Materials in Construction of Residence

75.     As noted above, Murray also used stolen Lowe's material in the construction of the residence on the Defendant Property.

76.     A deputy from the Highlands County Sheriff's Office advised LWPD investigators that, on or about October 19, 2019, he had responded to the Defendant Property for a suspicious incident. Upon arrival, the deputy discovered a residential construction site with a large U-Haul delivering roofing shingles at approximately 10:40 p.m. The occupants of the U-Haul truck were later determined to be A.N. and S.T. Utilizing law-enforcement databases, SA Sermons determined that A.N. and S.T. were associated with "(727) XXX-8779," which is the same number from an OfferUp advertisement for shingles from the "Mike Myers" Account linked to Murray.

---

[7] Remaining withdrawals during this time period were comprised of cash withdrawals (approximately $7,817), transfers to Murray's Inmate Commissary account (approximately $1,627.50), and other, minimal, retail transactions.

77.     SA Sermons received surveillance footage from Lowes that captured some of the fraudulent pickups tied to this investigation. During review, SA Sermons located surveillance video associated with two fraudulent Lowes orders that occurred on or about October 19, 2019 in Winter Haven, Florida and Kissimmee/Poinciana, Florida.

78.     The October 19, 2019 surveillance videos revealed a male and female receiving/loading the stolen Lowes merchandise into a Uhaul truck. Based on the overhead camera angle, the female captured in the Lowes surveillance video appeared to be similar in appearance to S.T., the individual who made a delivery to the Defendant Property on or about October 19, 2019.

79.     SA Sermons has reviewed the receipts associated with the October 19, 2019 fictitious pickups, and determined that the items stolen appeared to be associated with the construction of a home (i.e. bathroom vanity, contractor clean up bags, faucet, outdoor lighting, floor and wall tile, as well as tools used for roofing and painting).  The total approximate value of the items fraudulently acquired on October 19, 2019, and used in the construction of the Defendant Property was approximately $3,781.69.

**VIII.  <u>CONCLUSION</u>**

80.     As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its

burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show by a preponderance of the evidence that the Defendant Property is derived from proceeds of wire fraud and a conspiracy to commit wire fraud, and also constitutes property involved in money laundering.

## CONCLUSION

WHEREFORE, pursuant to Supplemental Rule G, Plaintiff United States of America requests that this Court initiate a process of forfeiture against the Defendant Property, and duly notice all interested parties to appear and show cause why the forfeiture should not be decreed. The United States further requests the Court order the Defendant Property forfeited to the United States for disposition according to law and grant the United States such other and further relief as this case may require.

Dated: June 30, 2020

Respectfully submitted,

MARIA CHAPA LOPEZ,
United States Attorney

By:

Suzanne C. Nebesky
Assistant United States Attorney
Florida Bar No. 59377
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
E-mail: suzanne.nebesky@usdoj.gov

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, John Sermons, declare under penalty of perjury that:

I am a Special Agent with the Federal Bureau of Investigation. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this 30 day of June, 2020.

John Sermons, Special Agent
Federal Bureau of Investigation